UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND;
and

ARTHUR H. BUNTE, JR.,                                    16-CV-708
Trustee,                                                           DECISION AND ORDER

              Plaintiffs,

      v.

NORFOLK SOUTHERN RAILWAY
COMPANY,

              Defendant.

_____

        On September 6, 2016, the plaintiffs commenced this action under the Employee

Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer

Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1001, *et seq.*  Docket

Item 1.  As explained in more detail below, the plaintiffs allege that the defendant,

Norfolk Southern Railway Company ("Norfolk Southern"), operated a rail yard in

Cheektowaga, New York.  *Id.*  Until October 2011, all drivers who worked in that rail

yard were employed by an entity called Automobile Distribution of Buffalo, Inc.

("Automobile Distribution").  *Id.*  But Norfolk Southern exercised so much control over

the terms and conditions of the drivers' employment that, according to the plaintiffs,

Norfolk Southern also employed the drivers.  *Id.*

        Automobile Distribution and its drivers were subject to collective bargaining

agreements requiring Automobile Distribution to make payments to plaintiff Central

States, Southeast and Southwest Areas Pension Fund ("the Pension Fund") for the retirement security of the drivers. *Id.* When Norfolk Southern terminated its contract with Automobile Distribution in October 2011, all the drivers were laid off. *Id.* The plaintiffs allege that Norfolk Southern is jointly and severally liable with Automobile Distribution under the MPPAA for "withdrawal liability"[1] owed to the Pension Fund. *Id.*

On November 17, 2016, Norfolk Southern moved to dismiss. Docket Item 10. It argued that it is not subject to withdrawal liability as a matter of law because it is not "an employer" within the meaning of the MPPAA and thus had no obligation to contribute to the Pension Fund. *Id.* On December 16, 2016, this Court referred this case to United States Magistrate Judge Jeremiah J. McCarthy for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 17. On January 13, 2017, the plaintiffs responded to Norfolk Southern's motion to dismiss, Docket Item 21; and on February 3, 2017, Norfolk Southern replied, Docket Item 22. After additional briefing, on April 25, 2017, Judge McCarthy issued a Report and Recommendation finding that the defendant's motion should be denied. Docket Item 29.

On May 9, 2017, Norfolk Southern objected to the R&R. Docket Item 31. On May 30, 2017, the plaintiffs responded to the objections, Docket Item 35, and on June 13, 2017, Norfolk Southern replied, Docket Item 36. This Court heard oral argument on July 6, 2017. Docket Item 37.

---

[1] Withdrawal liability is an "obligation to pay for vested, unfunded benefits when [an employer] withdraw[s] from a multiemployer pension plan." *Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Va. Pension Fund*, 718 F.2d 628, 642 (4th Cir. 1983); *see* 29 U.S.C. § 1381, *et seq.*

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). A district court must conduct a de novo review of those portions of a magistrate judge's recommendation to which objection is made. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully reviewed the thorough R&R, the record in this case, the objection and response, and the pleadings and materials submitted by the parties. Based on that de novo review, and for the reasons stated below, the Court accepts and adopts Judge McCarthy's recommendation to deny the defendant's motion.

## STATUTORY CONTEXT

"In enacting ERISA in 1974, . . . Congress sought to prevent the losses suffered by employees and their families when vested pension benefits were not paid because a pension plan was terminated before sufficient funds had been accumulated." *Korea Shipping Corp. v. N. Y. Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Tr. Fund*, 880 F.2d 1531, 1536 (2d Cir. 1989). "ERISA helped assure private-sector workers that they would receive the pensions that their employers had promised them." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995). It did so by requiring "employers to make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities; . . . if a plan became involvent, it held any employer who had withdrawn from the plan during the previous five years liable for a fair share of the plan's underfunding." *Id.*

But with respect to plans covering more than one employer, there was a problem. "Unfortunately, this scheme encouraged an employer to withdraw from a financially

shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat." *Id.* at 416-17. "Consequently, a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise." *Id.* at 417. "[C]oncern[s] for the financial stability of some multiemployer plans prompted Congress, in 1980, to enact th[e] provision of the MPPAA which states: 'If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined . . . to be the withdrawal liability.'" *Korea Shipping Corp.*, 880 F.2d at 1536 (quoting 29 U.S.C. § 1381(a)). "An employer may discharge that obligation by making a series of periodic payments according to a postwithdrawal schedule set by the pension fund's trustees, or it may prepay the entire debt at any time." *Bay Area Laundry and Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195 (1997).

These provisions in the "MPPAA helped eliminate [earlier] problem[s] by changing the strategic considerations." *Milwaukee Brewery Workers' Pension Plan,* 513 U.S. at 417. "It transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty." *Id.* "That is to say, it imposed a withdrawal charge on all employers withdrawing from an underfunded plan (whether or not the plan later became insolvent)." *Id.* "And it set forth detailed rules for determining, and collecting, that charge." *Id.*

The changes were made as part of "Congress' remedial and protective purposes in enacting the MPPAA." *Korea Shipping Corp.*, 880 F.2d at 1537. Indeed, "[t]he House Report to the MPPAA states that 'the basic policy of the Act is that the retirement

income security of multiemployer plan participants is best assured by fostering the growth and continuance of multiemployer plans. . . . A primary objective of the legislation is to insulate plans to the extent possible from declines, through sounder funding, employer withdrawal liability, and plan reorganization." *Korea Shipping Corp. v. N.Y. Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Tr. Fund*, 663 F. Supp 766, 768-69 (S.D.N.Y. 1987), *aff'd in part, rev'd in part*, 880 F.2d 1531 (2d Cir. 1989) (quoting 1980 U.S.Code Cong. & Admin. News, pp. 2918, 2933). The MPPAA must be read broadly "to insure the financial stability of the multiemployer plans." *Id.*

## **FACTUAL BACKGROUND**

"When considering a motion to dismiss, the court accepts 'the factual allegations in the complaint as true and draws all reasonable inferences in the plaintiffs' favor.'" *Amaker v. Goord*, 2019 WL 1033511, at *2 (W.D.N.Y. Mar. 5. 2019) (quoting *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018)). Therefore, the facts that follow are taken from the complaint.

The Pension Fund is a multiemployer pension plan. Docket Item 1 at 2. Plaintiff Arthur H. Bunte, Jr., is a trustee and fiduciary of the Pension Fund. *Id.* Norfolk Southern is a railroad company that operated a rail yard facility in Cheektowaga, New York. *Id.*

Until about October 2010, Automobile Distribution supplied Norfolk Southern with drivers for its operations at the rail yard facility under an agreement between the two companies (the "Norfolk Southern Agreement"). *Id.* at 3-4. But in late October 2010, Norfolk Southern terminated the Norfolk Southern Agreement, and the drivers at the rail yard facility were laid off. *Id.* at 4.

Norfolk Southern was Automobile Distribution's only client. *Id.* Automobile Distribution drivers were primarily responsible for moving rail cars around the rail yard facility, as well as loading and unloading automobiles on and off the rail cars. *Id.* at 3. If Automobile Distribution wanted to hire new drivers to work at the rail yard facility, the applicant had to submit to a background investigation by Norfolk Southern. *Id.*

As a practical matter, Norfolk Southern controlled the employment of Automobile Distribution's drivers. For example, Norfolk Southern trained new drivers who worked for Automobile Distribution. *Id.* Automobile Distribution drivers could not refuse an assignment given to them by Norfolk Southern management. *Id.* Norfolk Southern established the work rules and operating procedures for the drivers. *Id.* Norfolk Southern determined the work schedule of the drivers, the number of drivers who worked each day, the number of hours each driver worked, and when the drivers could leave at the end of the day. *Id.* Norfolk Southern conducted investigations regarding disciplinary matters related to the drivers. *Id.* Norfolk Southern laid off and recalled the drivers. *Id.* Norfolk Southern had the right to fire the drivers and could bar drivers from working at the rail yard facility. *Id.* at 4.

In addition, Norfolk Southern controlled the workplace. For example, Norfolk Southern owned the equipment used by the drivers, including the computer system and related computer software, as well as the devices used to load and unload the automobiles. *Id.* Norfolk Southern provided Automobile Distribution with office space at the rail yard facility at no cost. *Id.* Norfolk Southern also had full and complete access to Automobile Distribution's books and records. *Id.*

Not surprisingly, then, after Norfolk Southern terminated the Norfolk Southern Agreement with Automobile Distribution, all drivers at the rail yard facility were laid off. *Id.*

Automobile Distribution was obligated to make contributions to the Pension Fund under collective bargaining agreements executed between Automobile Distribution and a local union affiliated with the International Brotherhood of Teamsters. *Id.* at 5. After determining that Automobile Distribution no longer had an obligation to contribute to the Pension Fund or otherwise ceased all covered operations, the Pension Fund decided that Automobile Distribution had effected a "complete withdrawal" from the Pension Fund within the meaning of" the MPPAA. *Id.* Automobile Distribution therefore incurred withdrawal liability to the Pension Fund in the principal amount of $1,351,065.54. *Id.*

On or about July 21, 2011, Automobile Distribution received the Pension Fund's notice, demanding full payment of the entire amount of withdrawal liability by August 1, 2011. *Id.* Automobile Distribution failed to make that payment to the Pension Fund and did not timely initiate arbitration under 29 U.S.C. § 1401(a)(1). *Id.* The Pension Fund then sued Automobile Distribution, and in December 2011, the United States District Court for the Northern District of Illinois entered a consent judgment in favor of the Pension Fund in the amount of $1,648,465.98. *Id.* at 6. "To date, the full amount of the Automobile Distribution Judgment remains due and owing to the Pension Fund." *Id.*

The plaintiffs now seek to hold Norfolk Southern jointly and severally liable with Automobile Distribution for withdrawal liability. *Id.* at 7.

**DISCUSSION**

The MPPAA provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a). Norfolk Southern argues that as a matter of law it is not an "employer" under that provision. Docket Item 31 at 6-22.

I.      **"EMPLOYERS" UNDER 29 U.S.C. § 1381(a) ARE PERSONS OR ENTITIES WITH AN OBLIGATION TO CONTRIBUTE UNDER A MULTIEMPLOYER PLAN AS DEFINED IN 29 U.S.C. § 1392(a).**

"The MPPAA does not define 'employer.'" *Division 1181 A.T.U.-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 910 F.3d 608, 614 (2d Cir. 2018) (hereinafter "*Division 1181 A.T.U.*"). "In the absence of a statutory definition, [the Second Circuit has] construed the term as 'a person who is *obligated to contribute* to a plan either as a direct employer or in the interest of an employer of the plan's participants.'" *Id.* (emphasis in original) (quoting *Korea Shipping Corp.*, 880 F.2d at 1537). "The MPPAA, in turn, refers to an 'obligation to contribute arising—(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law.'" *Id.* (quoting 29 U.S.C. § 1392(a)). The Second Circuit therefore has analyzed whether there is an "obligation to contribute" by "using the framework established by 29 U.S.C. § 1392(a)." *Id.*; *see also Gramercy Wrecking and Envtl. Contractors v. Trucking Emps. of N. Jersey Welfare Fund, Inc.*, 2019 WL 1715949, at *1 (2d Cir. Apr. 16, 2019) (summary order).

In *Division 1181 A.T.U.*, "the parties agree[d] on appeal that *Korea Shipping* incorporated the MPPAA's statutory definition of 'obligation to contribute'" into

§ 1381(a).  910 F.3d at 614 (citing *Korea Shipping Corp.*, 880 F.2d at 1537 (2d Cir. 1989)).  For that reason, the court's decision to define "employer" under 29 U.S.C. § 1381(a) by "using the framework established by 29 U.S.C. § 1392(a)" technically does not bind this Court.  Nevertheless, the Second Circuit's acceptance of the parties' agreement on that issue is persuasive.

What is more, a close reading of *Korea Shipping* suggests that the statutory definition of "obligation to contribute" under § 1392(a) had already been incorporated by reference into the definition of "employer" by the Second Circuit.  In *Korea Shipping Corp.*, 880 F.2d at 1537, the Second Circuit was the first circuit court to address the definition of employer in § 1381(a).  *See Cent. States, Se. and Sw. Areas Pension Fund v. Int'l Comfort Prods., LLC*, 585 F.3d 281, 284 (6th Cir. 2009) (citing cases).[2]  The court defined "employer" by "agree[ing] with th[e] definition" of the district judge, Judge Edward Weinfeld.  *Korea Shipping*, 880 F.2d at 1537.

The district court opinion provides context for that definition.  Judge Weinfeld first noted that the statute intended a "broad reading of the term 'employer,' as used in reference to withdrawal liability, in order to insure the financial stability of the multiemployer plans."  *Korea Shipping Corp.*, 663 F. Supp. at 769.  Before actually

---

[2] *See also Cent. States Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 85 F.3d 1282, 1287 (7th Cir. 1996) (deriving definition of employer as an entity that "had an obligation to contribute" from *Korea Shipping*); *Seaway Port Auth. of Duluth v. Duluth-Superior ILA Marine Ass'n Restated Pension Plan*, 920 F.2d 503, 507 (8th Cir. 1990) (quoting *Korea Shipping*, 880 F.2d at 1537) ("The term employer in 29 U.S.C. § 1381(a) means 'a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants.'"); *Carriers Container Council, Inc. v. Mobile S.S. Ass'n Inc.-Int'l Longshoremen's Ass'n, AFL-CIO Pension Plan & Tr.*, 896 F.2d 1330, 1343-44 (11th Cir. 1990) (determining entity was an "employer" under § 1381(a) because it had an "obligation to contribute" to the pension plan and deriving reasoning from *Korea Shipping*).

defining the term "employer," Judge Weinfeld explained that when a primary contributor

to a pension fund was not a direct employer, the MPPAA would fail to function

effectively as intended unless the definition of employer included a "contributing

nonemployer." *Id.* at 770. Under such circumstances,

> [w]ere the contributing nonemployer's relationship with the direct employer terminated, it could withdraw as a contributor to the plan without fear of withdrawal liability since the Act would not be applicable to it. Nor would the Act be applicable to the actual employer since it imposes withdrawal liability only on "an employer [who] withdraws from a multiemployer plan," [citing 29 U.S.C. § 1381(a),] and withdrawal is defined as the cessation of the *obligation to contribute* under the plan or the cessation of covered operations under the plan [citing 29 U.S.C. § 1383(a)].

> Thus this Court finds that the term "employer," as used in 29 U.S.C. § 1381(a), is meant to include a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants.

*Id.*

Judge Weinfeld clearly derived the term "obligation to contribute" from the

MPPAA. So the Second Circuit's definition of employer under § 1381(a) as "a person

who is obligated to contribute to a plan either as a direct employer or in the interest of

an employer of the plan's participants," *Korea Shipping*, 880 F.2d at 1537 (quoting

*Korea Shipping*, 663 F. Supp. at 770), comes directly from the term "obligation to

contribute" as it is used in § 1383(a). And that, in turn, is a defined term under

§ 1392(a). Therefore, *Korea Shipping*'s definition of "employer" under § 1381(a)

"incorporate[s] the MPPAA's statutory definition of 'obligation to contribute,' which

includes both contractual and legal obligations." *Division 1181 A.T.U.*, 910 F.3d at 614;

*see also Int'l Comfort Prods.*, 585 F.3d at 286 (concluding that an employer is an entity

that "has an 'obligation to contribute' to a plan" as that "term is expressly defined by the

MPPAA"); *Canario v. Lidelco, Inc.*, 782 F. Supp. 749, 757 (E.D.N.Y. 1992) ("The

Second Circuit has held that the 'obligation to contribute' definition contained in 29 U.S.C. § 1392(a) is to be used in determining whether a business entity is responsible for withdrawal liability.").

Norfolk Southern argues that *Korea Shipping*'s definition cannot be read "to include *non-contributing* alleged joint employers such as Norfolk Southern." Docket Item 36 at 3. But Norfolk Southern's argument is focused on the facts of *Korea Shipping* and divorced from the statutory scheme and language. Contrary to Norfolk Southern's argument, nothing in the statutory scheme requires that an entity actually have contributed to a multiemployer plan to have had an *obligation* to contribute to a multiemployer plan. *See, e.g.*, 29 U.S.C. § 1392(a) (defining "obligation to contribute" without requiring an actual contribution to be made). Indeed, the statute's peculiar language seems intentionally designed to allow for the possibility that an entity may incur "withdrawal liability" when it never actually had contributed to a multiemployer plan as long as it was *obligated* to contribute to such a plan. Although one might imagine that Congress would create employer "withdrawal liability" that results from some termination of an *actual* contribution, Congress instead defined a "complete withdrawal" from a multiemployer plan as occurring when an employer "permanently ceases to have an *obligation* to contribute under the plan, or . . . permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a) (emphasis added). Therefore, the MPPAA imposes withdrawal liability on an employer even when an employer never contributed to a plan if the employer had an obligation to contribute to the plan and that obligation ceases.

In sum, an entity may incur withdrawal liability as an "employer" if the entity is "'a person who is *obligated to contribute* to a plan either as a direct employer or in the interest of an employer of the plan's participants.'" *Division 1181 A.T.U.*, 910 F.3d at 614 (emphasis in original) (quoting *Korea Shipping Corp.*, 880 F.2d at 1537). Whether an entity has an obligation to contribute to a plan is determined by considering the MPPAA's statutory definition of "obligation to contribute," which may arise "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law.'" *Id.* (quoting 29 U.S.C. § 1392(a)); *see also Gramercy Wrecking and Envtl. Contractors*, 2019 WL 1715949, at *1.

## II.    THE COMPLAINT STATES A CLAIM AS TO NORFOLK SOUTHERN'S OBLIGATION TO CONTRIBUTE TO THE PENSION FUND.

Now that this Court has addressed the statute's definition of entities that may be subject to withdrawal liability under § 1381(a), it turns to the precise question presented: whether the plaintiffs have stated a claim that Norfolk Southern had an obligation to contribute to the Pension Fund. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.* Courts must assume "that all the allegations in the complaint are true (even if doubtful in fact)." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (quoting *Bell Atl. Corp.*, 550 U.S. at 555). "[A] well-pleaded complaint may proceed even if it appears 'that a recovery is very

remote and unlikely.'" *Bell Atl. Corp.*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

**A.    Norfolk Southern's Obligations to Contribute to the Pension Fund Arising Under One or More Collective Bargaining (or Related) Agreements**

An entity may incur withdrawal liability for withdrawing from a multiemployer plan if it had an "obligation to contribute [to the plan] arising . . . under one or more collective bargaining (or related) agreements." 29 U.S.C. §§ 1381(a), 1392(a)(1). The complaint alleges that Automobile Distribution was bound by collective bargaining agreements executed between itself and a local union. Docket Item 1 at 5. It also alleges that "[p]ursuant to the Collective Bargaining Agreements, Automobile Distribution was required to make contributions to the Pension Fund on behalf of the drivers at the Facility." *Id.* But the complaint does not allege that Norfolk Southern was a party to those agreements or that those agreements expressly required Norfolk Southern to contribute to the Pension Fund.

That being said, "an entity can, under certain limited circumstances, be bound by (and therefore be obligated to contribute under) a [collective bargaining agreement] it did not sign." *Division 1181 A.T.U.*, 910 F.3d at 615. In *Division 1181 A.T.U.*, the Second Circuit suggested that the MPPAA might impose this liability in one of at least three ways: (1) under the terms of the collective bargaining agreement, (2) as a result of single-employer status, or (3) as a result of alter-ego status. *Id.* at 615-18. The plaintiffs suggest a fourth possibility: that Norfolk Southern is subject to MPPAA liability

under a "joint-employer" theory.[3]  This Court addresses each of those possibilities in turn.

### 1.    The Terms of the Collective Bargaining Agreement

If the terms of Automobile Distribution's collective bargaining agreement obligated Norfolk Southern to contribute to the Pension Fund—or perhaps if Norfolk Southern's contract with Automobile Distribution obligated Norfolk Southern to contribute—Norfolk Southern might have an obligation to contribute to the plan arising "under one or more collective bargaining (or related) agreements."  29 U.S.C. § 1392(a)(1).  But the complaint does not include facts suggesting that this is the case here.

### 2.    Single-Employer and Alter-Ego Status Under the Collective Bargaining Agreement

Even though the collective bargaining agreement or other agreements may not bind Norfolk Southern by their terms, "that does not end [a court's] analysis under 29 U.S.C. § 1392(a)(1)."  *Division 1181 A.T.U.*, 910 F.3d at 617.

#### a.    Single-Employer Doctrine

"Because a finding of 'single-employer' status would bind [Norfolk Southern] to the [collective bargaining agreements] signed by [Automobile Distribution], [the Court must] consider whether [the plaintiffs] adequately alleged that [Norfolk Southern and Automobile Distribution] were a single employer."  *Id.*  "A 'single employer' situation

---

[3] The plaintiffs argue that their joint-liability theory of MPPAA liability derives from 29 U.S.C. § 1392(a)(2).  This Court will address § 1392(a)(2) *infra*.  But in light of the Second Circuit's opinion in *Division 1181 A.T.U.*, the Court also addresses whether the plaintiffs' joint-employer theory is cognizable under § 1392(a)(1).

exists 'where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" *Clinton's Ditch Co-op Co., Inc., v. N.L.R.B.*, 778 F.2d 132, 137 (2d Cir. 1985) (quoting *N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982)). "The question in the 'single employer' situation, then, is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise.*" *Browning-Ferris Indus.*, 691 F.2d at 1122 (emphasis in original).

"[W]hether two firms are a single employer for collective bargaining purposes and whether a single contract is binding on two separate corporations are not only two different questions, but they may have different answers." *Carpenters Local Union No. 1846 of the United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 505 (5th Cir. 1982) (quoting *Local Union No. 59, Int'l Bhd. of Elec. Workers v. Namco Elec., Inc.*, 653 F.2d 143, 147 (5th Cir. 1981)). "A [collective bargaining agreement] that binds one entity also binds a non-signatory entity if (1) the two entities are a 'single employer' and (2) the employees of the entities 'constitute a single appropriate bargaining unit.'" *Division 1181 A.T.U.*, 910 F. 3d at 617 (quoting *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001)).[4]

---

[4] Because the defendant is a railway corporation, jurisprudence developing non-signatory liability for collective bargaining agreement obligations arising under the National Labor Relations Act may not be applicable. Instead, to the extent there is a difference, the Railway Labor Act's jurisprudence may provide the appropriate source of law. *See Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 376 (1969) (The NLRA "expressly exempt[s] from the Act's coverage employees and employers subject to the Railway Labor Act."). Nevertheless, "carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA." *See Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 432 (1989). Additionally, at least one circuit has looked to NLRA jurisprudence to analyze joint-employer and alter-ego theories of liability arising from

"Whether two entities constitute a 'single employer' is determined by four factors enumerated by the Supreme Court: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *United Union of Roofers, Waterproofers, and Allied Workers Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.*, 547 F. App'x 17, 19 (2d Cir. 2013) (citing *Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. Of Mobile, Inc.*, 380 U.S. 255, 256 (1965)). The Second Circuit has "added two additional factors: (5) 'the use of common office facilities and equipment,' and (6) 'family connections between or among the various enterprises.'" *Id.* (quoting *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996)). "While no single factor is dispositive, . . . control of labor relations [i]s 'central.'" *Id.* (quoting *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)).

"In determining whether the [entities'] employees constitute a 'single bargaining unit,' [the Second Circuit] look[s] for a 'community of interests' among the relevant employees, and factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee exchange." *Brown*, 250 F.3d at 128 n.2 (internal citations omitted).

b.    *Alter Ego Doctrine*

"Alter-ego status 'provides another analytical hook to bind a non-signatory to a [collective bargaining agreement].'" *Division 1181 A.T.U.*, 910 F.3d at 618 (quoting *Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co., Inc*, 944 F.2d 1037, 1046 (2d Cir. 1991)). "Courts generally use the 'alter ego' doctrine in

---

Railway Labor Act claims. *See Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900, 902-04 (6th Cir. 1991).

situations where a change in corporate or business entities threatens to evade collective bargaining obligations." *Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900, 902 (6th Cir. 1991).

"The alter ego doctrine, like the single employer doctrine, involves a flexible test that considers whether 'two enterprises have substantially identical management, business purpose[s], operation[s], equipment, customers, supervision, and ownership.'" *Division 1181 A.T.U.*, 910 F.3d at 618 (quoting *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010)). "The focus of the alter ego doctrine is on the existence of a disguised continuance or attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Id.* (quoting *Lihli Fashions.*, 80 F.3d at 748).[5]

> c.  *Norfolk Southern's Obligations Under the Collective Bargaining Agreement Resulting from Single-Employer or Alter-Ego Status*

Before the Court is a motion to dismiss, not a motion for summary judgment. Even when "allegations . . . are thin," they still may well be "sufficient to state a claim . . .

_____

[5] "Alter ego issues commonly arise in successorship situations, when ownership of a signatory company changes hands. Although a bona fide successor is not in general bound by a prior collective bargaining agreement, an alter ego will so be bound." *Carpenters Local Union No. 1846 of the United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 507 (5th Cir. 1982). "This is because an employer will not be able to evade obligations under the NLRA by setting up what appears to be a new company, but in reality is a 'disguised continuance' of the old one." *Id.* (quoting *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942)). Although "[t]he alter ego question most frequently arises in successorship situations, [it] has also been found in the double breasted construction cases where there is a shift of work traditionally performed by a union contractor to a substantially identical non-union firm." *Cuyahoga Wrecking Corp. v. Laborers Int'l Union of N. Am., Local Union No. 210*, 644 F. Supp. 878, 883 (W.D.N.Y. 1986). "Indeed, transfers of work from a company with a union contract to a non-union company have been the 'common thread' connecting alter ego cases." *Id.*

under an alter ego or single employer theory." *Pavers and Road Builders Dist. Council Welfare Fund v. J. Pizzirusso Landscaping Corp.*, 2018 WL 2186481, at *10 (E.D.N.Y. May 11, 2018); *see also Trs. of Laborers Union Local No. 1298 of Nassau and Suffolk Counties Ben. Funds v. A to E, Inc.*, 64 F. Supp. 3d 435, 441 (E.D.N.Y. 2014) (denying defendants' motion to dismiss even where "the relevant allegations as related to alter ego and single employer liability are somewhat sparse."). Whether the allegations are sufficient will depend on the factors noted above.

*Interrelation of Operations.* "The interrelation of operations element of the single employer test ultimately focuses on whether [Norfolk Southern] excessively influenced or interfered with the business operations of [Automobile Distribution], that is, whether [Norfolk Southern] *actually exercised* a degree of control beyond that found in the typical [railroad-contractor] relationship." *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997) (emphasis in original). Here, a number of facts alleged in the complaint indicate that the operations were interrelated. Automobile Distribution's only client was Norfolk Southern; in fact, Automobile Distribution existed only to "provide Norfolk Southern with drivers for its operations at the" rail yard. Docket Item 1 at 3-4. Norfolk Southern established the work rules and operating procedures for Automobile Distribution drivers. *Id.* at 3. Norfolk Southern controlled the training and work assignments of Automobile Distribution drivers. *Id.* Norfolk Southern supervised the drivers' daily activities. *Id.* Norfolk Southern decided when Automobile Distribution drivers would be laid off or recalled. *Id.* at 4. Norfolk Southern had "full and complete access to Automobile Distribution's books and records." *Id.*

All those factors demonstrate Norfolk Southern's control over Automobile Distribution's drivers. In some cases, control of workers might be insufficient to demonstrate that the operations of two entities were interrelated. But in this case, Automobile Distribution appears to have little, if any, function other than to supply Norfolk Southern with drivers. Therefore, Automobile Distribution had few, if any, other "operations" that could have been interrelated with Norfolk Southern's operations. Stated another way, the complaint suggests that few, if any, of Automobile Distribution's operations were *not* interrelated with the operations of Norfolk Southern.

For all these reasons, the complaint alleges facts supporting interrelation of operations.

*Centralized Control of Labor Relations.* The complaint explicitly alleges that "Norfolk Southern was responsible for all the labor relations relating to the drivers at the Facility." Docket Item 1 at 7. More specifically, the complaint alleges more than once that the companies had "joint control over hiring and firing decisions," *J. Pizzirusso Landscaping*, 2018 WL 2186481, at *10. *See*, *e.g.*, Docket item 1 at 3-4. Therefore, the complaint has sufficiently alleged facts that support this factor.

*Use of Common Office Facilities and Equipment.* The complaint alleges that "Norfolk Southern owned the equipment used by the drivers, including the computer system and related computer software and the equipment used to load and unload the automobiles." Docket Item 1 at 4. Likewise, it alleges that "Automobile Distribution had office space at the Facility which was provided by Norfolk Southern at no cost." *Id.* The complaint thus alleges the use of common office facilities and equipment.

*Common management.*  "In reviewing the common management factor, the existence of interlocking officers and directors is particularly relevant."  *Tewelde v. Albright*, 89 F. Supp. 2d 12, 18 (D.D.C. 2000).  But even without allegations that the two entities had overlapping officers and directors, the inquiry ultimately "involves the degree of actual or active control, not formal job titles or potential control over day to day operations."  *Chi. Reg'l Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d. 1351, 1357 (N.D. Ill. 2016); *see also Cimato Bros. Inc. and Cimato Bros. Constr., Inc. and Int'l Union of Operating Eng'rs, Local Union No. 17*, 352 NLRB 797, 799 (2008) ("Common management exists where one of the nominally-separate enterprises exercises actual or active control, as distinguished from potential control, over the other's day-to-day operations."). Given the facts alleged above, this court may infer that Norfolk Southern agents "were also the *de facto* decision-makers for" Automobile Distribution.  *TMG Corp.*, 206 F. Supp. 3d at 1357.

"To demonstrate single employer status, not every factor need be present, and no particular factor is controlling."  *Lihli Fashions*, 80 F.3d at 747.  Taken as true, the facts alleged in the complaint are sufficient to support all the single-employer status factors except common ownership and family connections[6] for the purposes of a motion to dismiss.  That status binds Norfolk Southern to Automobile Distribution's collective bargaining agreement if, in addition, the employees here constituted a single bargaining

_____

[6] "Common ownership by itself indicates only *potential* control" over one entity by the other entity; but "a single-employer relationship will be found only if one of the companies exercises *actual* or *active* control over the day-to-day operations or labor relations of the other."  *Dow Chemical Co.*, 326 NLRB 288, 288 (1998).  Here, the complaint indeed alleges such actual control, and so this factor may not be relevant. And the same presumably is true of family connections.

unit.  And because the employees all were drivers at the rail yard, the facts alleged in the complaint support that inference as well.  *See id.* at 747-48.

Ultimately, the issue will turn on such questions as whether drivers at the rail yard had a history of bargaining directly with Norfolk Southern or its predecessor, as opposed to a contractor.[7]  But because the analysis now turns only on the allegations in the complaint, those questions are left for resolution at a later stage of the litigation.  For now, the complaint sufficiently alleges that Norfolk Southern is subject to MPPAA withholding liability under a single-employer theory.[8]

---

[7] "In determining whether the [entities'] employees constitute a 'single bargaining unit,' [the Second Circuit] look[s] for a 'community of interests' among the relevant employees, and factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee exchange."  *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001) (internal citations omitted).

[8] This Court believes that the facts alleged also may support the claim that Norfolk Southern is liable for Automobile Distribution's obligations to contribute under the collective bargaining agreement under an alter-ego theory—at least for purposes of a motion to dismiss.  *See Pavers and Road Builders Dist. Council Welfare Fund v. J. Pizzirusso Landscaping Corp.*, 2018 WL 2186481, at *10 (E.D.N.Y. May 11, 2018) (and cases cited therein) (even where "allegations . . . are thin," they are "sufficient to state a claim . . . under alter ego or single employer theory").  The alter-ego doctrine "involves a flexible test."  *Division 1181 A.T.U.*, 910 F.3d at 618.  "The question of whether companies constitute alter egos of each other, involves the examination of similar criteria [as whether they are a single employer], plus an examination of the purpose of the formation of the additional companies."  *Three Sisters Sportswear Co.*, 312 NLRB 853, 861 (1993) (cited in *Lihli Fashions*, 80 F.3d at 747).  Here, the facts support a number of alter ego doctrine factors, including the same operations, equipment, customers, and supervision.

Furthermore, in considering whether alter-ego status exists, "evidence of 'anti-union animus or an intent to evade union obligations may be germane.'"  *Lihli Fashions*, 80 F. 3d at 748 (quoting *Goodman Piping Prods., Inc. v. NLRB*, 741 F.2d 10, 12 (2d Cir. 1984)).  Here, the National Mediation Board has found that the Automobile Distribution drivers' work is "work that is traditionally performed by employees in the railroad industry."  *Re: Auto. Distrib. of Buffalo, Inc. and Complete Auto Network*, 37 NMB 372, 2010 WL 3454200, at *5 (Sept. 3, 2010).  Therefore, one could infer that Norfolk

### 3. Joint-Employer Status Under the Collective Bargaining Agreement

As noted above, alter-ego theory is based on the principle that two entities are "in reality the same employer"; that one "corporation is the 'alter ego' of the [other], [in other words,] it is 'merely a disguised continuance of the old employer.'" *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd., Hotel and Rest. Emp. and Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 259 n.5 (1974) (quoting *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942)). "Such cases involve a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management." *Id.* The single-employer theory is similar. *See Clinton's Ditch*, 778 F.2d at 137. "In these circumstances, [the companies at issue are] in reality the same employer and [therefore are] subject to all the legal and contractual obligations of [each other]." *Howard Johnson Co.*, 417 U.S. at 259 n.5.; *see also Clinton's Ditch*, 778 F.2d at 137 (quoting *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402 (1960)) (single employer standard is relevant where "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise.'").

Here, the plaintiffs argue that Norfolk Southern had an obligation to contribute to the Pension Fund for another, conceptually-different reason as well: because it was a

---

Southern contracted this work out to Automobile Distribution in order to avoid union obligations in the first place.

The facts alleged allow "the court to draw the reasonable inference that the defendant is liable" under an alter-ego theory. *Ashcroft*, 556 U.S. at 678. For both single-employer and alter-ego theories, discovery may produce evidence that fleshes out the relevant factors one way or the other.

joint employer with Automobile Distribution. Docket Item 35 at 11-16.[9] "The 'joint employer' and 'single employer' concepts are distinct . . . [and] approach the issue of 'who is the employer' from two different viewpoints." *Browning-Ferris Indus.*, 691 F.2d at 1122. "As such, different standards are required for each." *Id.*

In a "joint employer" relationship, unlike a "single employer" relationship, "there is no single integrated enterprise." *Clinton's Ditch*, 778 F.2d at 137. "A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly." *Id.* "[I]t is rather a matter of determining which of two [entities], or whether both, . . . control, in the capacity of employer, the labor relations of a given group of workers." *Browning-Ferris Industries*, 691 F.2d at 1122-23 (quoting *NLRB v. Condenser Corp. of Am.*, 128 F.2d 67, 72 (3d Cir. 1942)). "The basis of the finding is simply that one employer[,] while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Id.* at 1123. Specific considerations include "whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5)

---

[9] Even though the complaint expressly alleges that Norfolk Southern and Automobile Distribution were joint employers, not a single employer, this Court has analyzed the complaint under both tests because "the joint employer and single employer tests are sometimes confused." *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1226 (10th Cir. 2014) (quoting *Bristol v. Bd. Of Cty. Comm'rs of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002)); *see also N.L.R.B. v. Browning-Ferris Indus. of Pa, Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982) ("Admittedly, there has been a blurring of [the joint-employer and single-employer] concepts at times by some courts and by the [NLRB].").

participated in the collective bargaining process." *Serv. Emps. Int'l Union, Local 32BJ v. N.L.R.B.*, 647 F.3d 435, 443 (2d Cir. 2011) (quoting *AT&T v. NLRB*, 67 F. 3d 446, 451 (2d Cir. 1995)).

"Thus, the 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Browning-Ferris Indus.*, 691 F.2d at 1123. (emphasis in original). "[A]n employee formally employed by one entity can be found to be constructively employed by another entity, and thus may impose liability for violations of employment law on the constructive employer." *Griffin v. Sirva Inc.*, 835 F.3d 283, 292-93 (2d Cir. 2016) (quoting *Fowler v. Scores Holding Co. Inc.*, 677 F. Supp. 2d 673, 681 (S.D.N.Y. 2009)).

"Joint employer" analysis is not parallel to that of an "alter ego" or "single employer" because the latter theories mean that the entities are "in reality the same employer," *Howard Johnson Co.,* 417 U.S. at 259 n.5, but the former involves "the control two separate companies exercise over the same employees," *Sun Chem. Corp. v. Int'l Bhd. of Teamsters Local No. 705*, 1992 WL 133175, at *3 (N.D. Ill. June 11, 1992). Here, the plaintiffs have not sufficiently explained how joint-employer status should result in imputing Automobile Distribution's contractual obligations to Norfolk Southern under 29 U.S.C. § 1392(a)(1). So joint-employers status alone does not mean that Norfolk Southern shared Automobile Distribution's § 1392(a)(1) obligation to contribute to the Pension Fund.[10]

---

[10] As explained in note 3, *supra*, the plaintiffs argue that the defendant's joint-employer status is relevant not under 29 U.S.C. § 1392(a)(1), but under § 1392(a)(2), to which this Court turns next. That being said, this Court leaves open and does not

**B. Norfolk Southern's Obligations to Contribute to the Pension Fund Arising Under Applicable Labor-Management Relations Law**[11]

An entity also may incur withdrawal liability when it withdraws from a multiemployer plan if it had an "obligation to contribute [to the plan] arising . . . as a result of a duty under applicable labor-management relations law." 29 U.S.C. §§1381(a), 1392(a)(2). *See Laborers Health and Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 545-46 (1988) ("obligation to contribute" under § 1392(a)(2) includes "any obligation imposed by the [National Labor Relations Act "NLRA"]"); *Division 1181 A.T.U.*, 910 F.3d at 619. "That definition is significant because it demonstrates that Congress was aware of the two different sources of an employer's duty to contribute to covered plans." *Advanced Lightweight Concrete*, 484 U.S. at 546.

When Congress passed § 1392(a)(2), it probably intended primarily to ensure that employers still incur withdrawal liability even if they withdraw from a multiemployer plan after a collective bargaining agreement expires. As the National Labor Relations Board has explained, "[s]ection 8(a)(5) and 8(d) of the [NLRA] make it an unfair labor practice for an employer to refuse to bargain 'in good faith with respect to wages, hours,

---

address the question of whether traditional principles of agency law might lead to the conclusion that a joint employer is bound by the contractual obligations of another joint employer.

[11] *See Tr. of Colo. Pipe Indus. Pension Tr. v. Howard Elec. & Mech. Inc.*, 909 F.2d 1379, 1385 (10th Cir. 1990) (although the NLRB has jurisdiction over many labor law questions, federal courts maintain jurisdiction to determine labor law questions that emerge as "an issue collateral to the independent federal remedy of withdrawal liability"); *see also Connell Const. Co. Inc. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 626 (1975) ("the federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies, including the antitrust laws").

and other terms and conditions of employment.'" *Cofire Paving Corp.*, 359 NLRB 180, 183 (2012). "[A]n employer violates Section 8(a)(5) if, when negotiations are sought or are in progress, it unilaterally changes a term or condition of employment without first bargaining to impasse." *Id.* "Moreover, with a few exceptions, contractually established terms and conditions that are mandatory subjects of bargaining must be continued in effect as the status quo after the contract has expired until the parties negotiate a new agreement or bargain to impasse in the negotiations for a collective-bargaining agreement as a whole." *Id.* "The existing terms and conditions continue in effect *by operation of the Act; they are no longer contractual terms but imposed by law.*" *Id.* (emphasis added).

Furthermore, "[t]he obligation to maintain the status quo includes the maintenance of fringe benefits, such as . . . welfare, pension, and annuity benefits." *Id.* at 184. "Such benefits are terms and conditions of employment that survive the expiration of the contract and cannot be altered without bargaining." *Id. See also N.L.R.B. v. Katz*, 369 U.S. 736, 747 (1962) (an employer violates NLRA § 8(a)(5) if, when negotiations are sought or are in progress, it unilaterally changes a term or condition of employment without first bargaining to impasse).

But even though Congress may have had in mind the obligation to maintain payment of fringe benefits, including pension fund payments, after a collective bargaining agreement expires when it enacted § 1392(a)(2), Congress did not limit the provision to that narrow circumstance. Instead, Congress comprehensively indicated that an "obligation to contribute" may arise "as a result of a duty under applicable labor-management relations law," § 1392(a)(2), which is broader.

26

What is more, if Norfolk Southern was a joint employer with Automobile Distribution when it terminated its contract with Automobile Distribution in 2011, the "applicable labor-management relations law" imposed a duty on Norfolk Southern to bargain with its workers—the rail yard facility drivers. "The [NLRA] is based largely upon a conception of the right to collective bargaining as the solvent of all industrial ills." *N.L.R.B. v. Cities Serv. Oil Co.*, 122 F.2d 149, 152 (2d Cir. 1941). "An employer will violate [its corresponding] statutory duty [to bargain] if it unilaterally changes a term or condition of employment without first giving the union a chance to bargain meaningfully over the change." *G. Heileman Brewing Co. v. N.L.R.B.*, 879 F.2d 1526, 1530 (7th Cir. 1989). Even where one company "was the actual employer of [certain workers, another entity] would also be subject to this statutory duty to bargain [with the applicable union] if it was a joint employer of the [workers]." *Id.*; *see also G. Heileman Brewing Co.*, 290 NLRB 991, 1001 (1988) ("As the Company was the joint employer of the [workers] in an appropriate unit, and the Union was the exclusive collective-bargaining representative of that unit, it follows that the Company was obligated to recognize and bargain with the Union concerning the terms and conditions of their employment.").

When (1) an entity contracts with a contractor for services, (2) the contractor formally hires and employs workers, but the entity exercises sufficiently "consistent contact and control over the day-to-day incidents of the [workers'] employment relationship" so that the entity and the contractor are joint employers, and (3) the entity terminates the contract with the contractor, labor law may impose a duty on both joint employers to bargain with the workers. *See Am. Air Filter Co.*, 258 NLRB 49, 52-53 (1981). Together with "[t]he [employer's] obligation to maintain the status quo

includ[ing] the maintenance of fringe benefits" during any period of mandatory

bargaining, *Cofire Paving Corp.*, 359 NLRB at 184, that duty to bargain may create an

"obligation to contribute arising . . .as a result of a duty under applicable labor-

management relations law." 29 U.S.C. § 1392(a)(2).[12]

Of course, Norfolk Southern would have a duty to bargain only if there were

some explicit or implicit request by the workers at the rail yard facility to bargain with it.

> While the [NLRA] makes it the employer's duty to bargain with his
> employees, and failure to perform that duty entails serious consequences
> to him, it imposes no like duty on his employees. Since there must be at
> least two parties to a bargain and to any negotiations for a bargain, it follows
> that there can be no breach of the statutory duty by the employer—when he
> has not refused to receive communications from his employees—without
> some indication given to him by them or their representatives of their desire
> or willingness to bargain. In the normal course of transactions between
> them, willingness of the employees is evidenced by their request, invitation,
> or expressed desire to bargain, communicated to their employer.

*N.L.R.B. v. Columbia Enameling & Stamping Co.*, 306 U.S. 292, 297 (1939).

But there is a wrinkle in this analysis—one not raised directly by either of the

parties. The defendant is a railroad; therefore, the NLRA gives way to the Railway

Labor Act ("RLA"). *See* 29 U.S.C. § 152(2) ("any person subject to the Railway Labor

Act" is not an "employer" subject to the NLRA). Indeed, in 2010, the National Mediation

Board ("NMB") advised the NLRB that, in its opinion, both Norfolk Southern and

Automobile Distribution were subject to the RLA and the NMB's jurisdiction because

---

[12] The Ninth Circuit and Seventh Circuit have concluded that where the NLRB
has not certified that an employer is a joint employer, an employer may not be held
liable for failure to bargain. *See Cent. Transp., Inc. v. N.L.R.B.*, 997 F.2d 1180, 1185-86
(7th Cir. 1993); *Alaska Roughnecks and Drillers Ass'n v. N.L.R.B.*, 555 F.2d 732, 736
(9th Cir. 1977). The Second Circuit has not addressed the issue explicitly but has
indicated that the situation presents a "significant due process claim." *Int'l House v.
N.L.R.B.*, 676 F.2d 906, 912 (2d Cir. 1982).

"Norfolk Southern exercises substantial control over [Automobile Distribution] and its employees." *In re Auto. Distrib. of Buffalo, Inc. & Complete Auto Network*, 37 NMB 372, 2010 WL 3454200, at *7 (Sept. 3, 2010). Therefore, the "applicable labor-management relations law" under 28 U.S.C. § 1392(a) is not the NLRA but the RLA.

Even under the RLA, however, Norfolk Southern may have been subject to a duty to bargain and to maintain the status quo, thus creating a labor-management relations law obligation to contribute to the fund under the facts alleged in the complaint. *See* 45 U.S.C. § 156. Under RLA § 2,

> [i]t shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C § 152. "This duty is 'the heart of the Railway Labor Act.'" *Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787, 790 (2d Cir. 1980) (quoting *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377-78 (1969)). It "is a legally enforceable obligation, rather than a 'mere statement of policy or exhortation.'" *Id.* (quoting *Chi. & N.W. Ry. V. United Transp. Union*, 402 U.S. 570, 577 (1971)).

The RLA duty to bargain includes a similar requirement to maintain the status quo while the employer bargains with its workers. In fact, the duty under the RLA actually may be broader and more favorable to workers than that imposed by the NLRA. "The obligation of both [the workers and the railroad] during a period in which [a] status quo provision[] is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that

dispute." *Detroit & T.S.L.R. Co. v. United Transp. Union*, 396 U.S. 142, 152-53 (1969). And the railroad's duty to preserve the status quo goes beyond "those working conditions covered in the parties' existing collective agreement." *Id.* at 153. It instead "extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement." *Id.*

This Court recognizes that the complaint does not allege that Norfolk Southern *actually* contributed to the Pension Fund. But the Pension Fund payments were "actual, objective working conditions and practices, broadly conceived" because they were received by workers who performed services for Norfolk Southern—the drivers. *Id.* And the complaint alleges that these workers were employed by Norfolk Southern. Although the payments were made by Automobile Distribution, Automobile Distribution, in turn, was paid by Norfolk Southern. Therefore, at least compared to any other feasible alternative "status quo," Norfolk Southern would have been obligated to maintain the drivers' pay and benefits during any negotiation over the implication of Norfolk Southern's termination of its contract with Automobile Distribution.[13]

---

[13] This Court's reasoning is supported by National Labor Relations Board precedent. For example, in *American Air Filter*, 258 NLRB 49, (1981), a corporation that manufactured air filters contracted with a company—Transport Associates, Inc. ("Transport")—to supply it with drivers. *Id.* at 50. When American Air Filter Company, Inc., ("AAF") "terminated its contract with Transport, the drivers found themselves without work." *Id.* at 52. The Board found that AAF was a joint employer with Transport, *id.* at 54, and that "it follows that [AAF's] bargaining duty was no less than that of Transport," *id.* at 53. The Board found that "by contracting out work previously performed by the drivers, without notifying or bargaining with [the union] about that decision or the effects of replacing the men with other employees, [AAF] violated [the NLRA]." *Id.* at 54. As a remedy, among other things, the Board ordered AAF to "[m]ake whole those employees displaced by its termination of the contract with Transport . . . for any loss of pay and other benefits," even though that pay and those benefits were negotiated in a collective bargaining agreement between the workers and Transport. *Id.* at 55.

Because the parties have not briefed the extent and nature of Norfolk Southern's RLA duties to bargain and to maintain the status quo, this Court need not now determine whether these standards are materially different from those in the NLRA. *See Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 432 (1989) ("carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA"). For now, it is enough that the facts alleged in the complaint plead or support reasonable inferences (1) that Norfolk Southern was a joint employer with Automobile Distribution when it terminated its contract with Automobile Distribution; (2) that Norfolk Southern had a duty to bargain with the drivers at that time; and (3) that Norfolk Southern therefore was obligated to continue the status quo during that time, including to contribute to the Pension Fund.[14]

In sum, whether Norfolk Southern had an obligation to contribute to the Pension Fund under § 1381(a) "is a question of fact that cannot be decided on a motion to dismiss." *Fowler*, 677 F. Supp. 2d at 681. For all the reasons stated above and for the reasons in the Report and Recommendation, the defendant's motion to dismiss, Docket

---

[14] The complaint claims that "[a]s a joint employer with Automobile Distribution, Norfolk Southern is jointly and severally liable with Automobile Distribution for the withdrawal liability owed to the Pension Fund." Docket Item 1 at 7. Provided that Norfolk Southern is an "employer" subject to the MPPAA regarding the drivers, the scope of its withdrawal liability is determined by the Pension Fund—with any dispute subject to mandatory arbitration. *See* 29 U.S.C. § 1401. But it is worth noting for statutory context that to the extent Norfolk Southern is found to be a joint employer with an obligation to contribute "arising . . . as a result of a duty under applicable labor-management relations law," 29 U.S.C. § 1392(a)(2), Norfolk Southern's withdrawal liability and Automobile Distribution's withdrawal liability may be separate and distinct. *See* Pension Benefit Guaranty Corporation, Opinion Letter 86-10 (April 10, 1986); Pension Benefit Guaranty Corporation, Opinion Letter 85-14 (May 28, 1985) (joint employer which may have obligation under the NLRA to contribute to a plan does "not constitute a single employer and [its] obligations and liabilities . . . would be determined separately.").

Item 10, is DENIED.  The case is referred back to Judge McCarthy for further proceedings consistent with the referral order of December 16, 2016, Docket Item 17.

SO ORDERED.


Dated:      May 1, 2019
            Buffalo, New York


                                        s/ Lawrence J. Vilardo
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE